THE CHICAGO LIFE INSURANCE COMPANY

*v.*

THE AUDITOR OF PUBLIC ACCOUNTS.

*Filed at Ottawa November 10, 1881.*

1. DISSOLUTION OF INSURANCE COMPANIES—*constitutionality of act of 1874.* The statute of 1874, which authorizes the Auditor to take proceedings for the dissolution of a life insurance company organized in this State under a special charter, granted prior to the passage of that act, whenever he shall be of opinion that such company is insolvent, or its condition is such as to render its further continuance in business hazardous to the insured therein, or to the public, or when the company has failed to comply with the rules, restrictions or conditions provided by law, is not unconstitutional, as impairing the obligation of contracts, especially when such a company has accepted an amendment of its charter, which declares that it shall not be deemed to exempt the company from the operation of such general laws as might afterwards be passed.

2. SAME—*act whether special, regulating practice in courts.* A statute for the dissolution of insurance companies for insolvency, etc., and providing the mode of procedure to have such corporations dissolved, which applies alike to all insurance companies, is not a special law regulating the practice in courts of justice, within the prohibition of sec. 22 of art. 4 of the constitution of 1870.

3. SAME—*change of remedy against insolvent company.* The general Insurance law of 1869 provided, that on notice by the Auditor an insurance company should cease issuing policies, where its assets were not equal to its liabilities, until its funds should be made equal to its liabilities. In 1874,

another and different penalty was provided for insolvency, etc., viz: a dissolution of the corporation: *Held*, that the legislature had the right to change the penalty and remedy, and that the later law must govern.

4. SAME—*evidence sustaining a decree of dissolution.* By the charter of a life insurance company, $100,000 of stock had been subscribed as required, but only ten per cent thereof had been paid in, and the evidence showed that in 1867 the remainder was professedly paid by the notes of the subscribers, payable in nearly all cases on demand, and without interest, payment of which was never demanded, and which were in no way secured, under which the company proceeded to insure, and from 1871 to 1876 made false reports of a capital stock of $125,000 paid up in cash, and during the same time made dividends, in violation of its by-laws, of $55,045, when it was in no condition to pay any dividends, and from 1873 to 1876 it scheduled securities, amounting to $89,422, which it had bought but had never paid for, and made false reports of its receipts and expenditures, and on examination of its affairs and books they showed a heavy deficiency of assets to meet its liabilities: *Held*, that a decree for the dissolution of the company was warranted.

5. SAME—*unpaid securities are not assets.* Securities taken in the name of an insurance company, in the expectation of becoming its property when paid for, but not paid for, are not *bona fide* assets of the company, and exhibiting them as such in the company's report to the Auditor is deceptive to him, and to persons taking insurance, and to the public.

6. SAME—*good will is not assets.* An insurance company can not establish its solvency, such as the statute requires, by proof that its good will is of the value of $100,000 to $150,000. This can not be treated as assets of the company. The assets required by law are funds that will pay losses and liabilities of the company.

7. SAME—*deficiency of assets—how found.* Under the Insurance law of 1869, where the actual funds of any life insurance company are not of a net value equal to the net value of its policies, according to the "combined experience," or "actuary's" rate of mortality, with interest at four per cent per annum, the Auditor is required to give notice, etc. Under this law it is not proper to estimate on the basis of six per cent in determining the impairment, but the four per cent basis as fixed in the law must govern as showing the deficiency of assets.

8. SAME—*standard of solvency.* The law requires a higher standard of solvency in an insurance company than that its assets shall be sufficient to meet and pay its matured liabilities. It requires that its assets shall be equal to all its liabilities, whether due or not.

9. SAME—*offer to re-insure, no defence to proceeding to dissolve corporation.* In a proceeding by the Auditor to have a life insurance company dissolved, under the general law of 1874, for insolvency, an offer by the company to re-insure in other companies for its policyholders is no defence, and can not be taken as making up the company's deficiency of assets.

10. SAME—*responsible for the acts of its officers.* The fact that the mismanagement of an insurance company, making its condition such as to be hazardous to the public and parties insured, is attributable to the secretary alone, is no defence to a proceeding by the Auditor to close its business. The public are entitled to protection, no matter by whom the affairs of the company have been mismanaged.

WRIT OF ERROR to the Circuit Court of Cook county; the Hon. MURRAY F. TULEY, Judge, presiding.

Messrs. C. C. & C. L. BONNEY, for the plaintiff in error, made the following among various other points:

The act under which this proceeding was had impairs the obligation of the contract in their charter. Const. of the United States, sec. 10, art. 1; const. of Illinois, 1870, sec. 14, art. 2.

The act contravenes sec. 22 of art. 4 of the State constitution, which declares that the legislature shall not pass special laws regulating the practice in courts of justice.

The law of 1874 was not intended to apply to corporations formed under special charters prior to the adoption of the present constitution. *Union Ins. Co.* v. *Frear Stone Mfg. Co.* 97 Ill. 545; *Wincock et al.* v. *Turpin,* 96 id. 144.

The legislature has no power to impose arbitrary and oppressive conditions upon the assertion and exercise of vested rights. *Conway* v. *Cable et al.* 38 Ill. 87.

The law never favors forfeitures by construction. All laws providing forfeitures must be strictly construed. *Chicago* v. *Rumpff,* 45 Ill. 99; *Hartford Ins. Co.* v. *Walsh,* 54 id. 168; *Baker et al.* v. *Admr. of Backus,* 32 id. 109; *First National Bank of Sioux City* v. *Gage et al.* 79 id. 209.

Definition of solvency: Burrill on Assignments, 38, 40; Bouviers' Law Dic. title "Insolvent."

The right to compel a substantial performance of the contract can not be taken away under a pretence of regulating the remedy. *Walker* v. *Whitehead,* 16 Wall. 317; *Merton* v. *Valentine,* 15 La. Ann. 153.

The legislature has not the power to add new and independent conditions to a grant, such as a wider draw for a bridge than required by the original act. *Commonwealth* v. *Breed,* 4 Pick. 460.

In a proceeding to forfeit corporate franchises, the alleged unlawful acts must be alleged to have been willfully or negligently done. *Attorney General* v. *M. V. and C. R. R. Co.* 51 Miss. 606.

A temporary suspension of specie payment by a bank does not work a forfeiture of its charter, especially when a penalty of twelve per cent is provided. *State* v. *Commercial Bank,* 10 Ohio, 538.

The legislature has no power to impose on corporations new causes of forfeiture subsequent to their charters. It may prescribe new modes of remedy, but can not change the conditions of the contract. *Aurora Co.* v. *Hotthouse et al.* 7 Ind. 61; *Powell* v. *Sammons et al.* 31 Ala. 558; *State* v. *Noyes,* 47 Maine, 214; *People* v. *Jackson and Michigan Plank Road Co.* 9 Mich. 285; *State* v. *Tombeckee Bank,* 2 Stew. (Ala.) 36; *Bailey* v. *Railroad Co.* 4 Harring. 399.

A reservation of power to alter, modify or repeal a charter, does not authorize the legislature to impose an additional burden of expense, without compensation. *Miller* v. *Railroad Co.* 21 Barb. 513; *Holyoke Co.* v. *Lyman,* 15 Wall. 522.

Mr. E. B. SHERMAN, for the defendant in error, among various others made the following points of law:

The acts of 1869 and 1874 are constitutional and valid, and are not contrary to the constitution of the United States. *Ward* v. *Farwell,* 97 Ill. 593; Angell & Ames, sec. 774, and cases cited; *Ohio and Mississippi R. R. Co.* v. *McClelland,* 25 Ill. 140; *Bank* v. *Willard,* 24 id. 140; *Moore* v. *Whitcomb,* 48 Mo. 543; *Munn* v. *People,* 69 Ill. 93; *Munn* v. *Illinois,* 4 Otto, 113; *In the matter of Jackson,* 4 Sanford, 596; *Slee* v. *Bloom,* 19 Johns. 71; *Slee* v. *Bloom,* 5 Johns. Ch. 380;

*Gowen* v. *Penobscot R. R. Co.* 44 Maine, 140 ; *Inhabitants of Veazie* v. *Mayo*, 45 id. 560 ; *Commonwealth* v. *F. and M. Bank*, 21 Pick. 542 ; *Com. Bank of Rodney* v. *State*, 4 S. & M. 439 ; *Missouri* v. *Matthews*, 44 Mo. 523 ; *Bank* v. *Attorney General*, 3 Wend. 588 ; *Tennessee* v. *Sneed*, 6 Otto, 69 ; *Fertilizing Co.* v. *Hyde Park*, 7 id. 659 ; *Turnpike Co.* v. *People*, 82 Ill. 174 ; *United States* v. *Union Pacific R. R. Co.* 8 Otto, 605.

If the English language can convey an idea clearly and unmistakably, then the words "any insurance company," employed in the law of 1874, include life insurance companies as well as fire insurance companies, and authorize proceedings against either.

The Chicago Life Insurance Company, by virtue of an amendment to its charter, adopted February 21, 1867, and accepted by it, is specifically made subject to all general laws regulating insurance companies thereafter to be enacted; and the law of 1869 regulating life insurance companies, and the act of 1874 regarding the dissolution of insurance companies, thereby virtually became, when enacted, a part of its charter.

Mr. Justice Sheldon delivered the opinion of the Court:

This was a petition filed by Thomas B. Needles, Auditor of Public Accounts of the State, in the circuit court of Cook county, at the July term, 1877, against the Chicago Life Insurance Company, under the "Act in regard to the dissolution of insurance companies," approved February 17, 1874, praying that the company be enjoined from further proceeding with their business. Upon final hearing, at the July term, 1881, the court made a decree perpetually enjoining the company from the further prosecution of its business, and the company appealed.

The statute under which the petition was filed authorizes the proceeding whenever the Auditor shall be of opinion that the company is insolvent, or its condition such as to render

its further continuance in business hazardous to the insured therein, or to the public, or where the company has failed to comply with the rules, restrictions or conditions provided by law.

The point is made that the statute under which this proceeding is had, is, as applying to this company, unconstitutional. This question of constitutionality is fully settled by the recent decision of this court in *Ward* v. *Farwell*, 97 Ill. 593, where it was decided that this act of 1874 was constitutional, and that it was so as applied to the Republic Life Insurance Company, incorporated under a special charter granted before the passage of the act of 1874, to-wit, March 22, 1869, in whose charter no specific reservation of legislative control was contained. By section 5 of an act amending the charter of the present company, approved February 21, 1867, it is provided as follows: "This act, and the act to which this is an amendment, shall not be deemed to exempt said company from the operation of such general laws as may be hereafter enacted by the General Assembly on the subject of life insurance." Afterward, on March 29, 1867, said amendment to the charter, of which the foregoing was a part, was formally adopted by the company. This strengthens the application of the decision in *Ward* v. *Farwell* to the present case.

There is one point of objection against the constitutionality of the statute made in this case, which it is said was not raised in the case of *Ward* v. *Farwell*, viz: that it is a special act regulating the practice in courts of justice, and providing a different method of procedure for a single class of corporate persons from that required in all other cases, and thus is in violation of section 22 of article 4 of the constitution of the State, prohibiting the passage of special laws regulating the practice in courts of justice. This method of procedure is applicable to all insurance companies, and is not special legislation, and does not come within such prohi-

bition. Various other points are made against the validity of the act of 1874, but we consider all of them to have been fully met and decided in favor of the act in *Ward* v. *Farwell*, and that it is unnecessary to notice them further.

It is contended that the proofs do not make a case, under the law.

It appears from the evidence that before the change of the corporate name of the company by the amendment to its charter of February 21, 1867, $100,000 of stock had been subscribed for, and ten per cent thereof paid in cash, that being the only payment in cash upon such stock subscriptions, with perhaps one exception; that the remainder of such subscriptions to the stock, after the change of its corporate name, was professedly paid for by the notes of the stock subscribers, payable in nearly all cases on demand, and without interest, the payment of which notes was never demanded by the company, and the notes were not secured by a deposit of real estate security and other collaterals. The company proceeded to do business with no other capital or resources. From 1871 to 1876 the company made annual sworn reports to the Auditor of the State, pursuant to the law of 1869, in all of which the capital stock of the company to the amount of $125,000, was stated to be fully paid up in cash. In 1871 the company began to declare dividends to the stockholders, which were regularly declared to 1876, the amount being $55,045, and this in violation of a by-law that all dividends should be applied in payment of capital stock subscribed, until the same should be paid; and during the time the company was not in a condition to justify the paying of any dividends. In the annual sworn statements made to the Auditor, from 1873 to 1876, there were included and scheduled as part of the assets of the company a large amount of securities for which it had never paid, and which it did not own, they amounting, in 1876, to $89,422. The receipts of the company as shown by its books, varied largely from its

receipts as shown in its sworn reports to the Auditor, such discrepancy in the total receipts, from 1871 to 1876, appearing to be $95,006.46. There was the like discrepancy as to disbursements, they appearing for that same time, as reported to the Auditor, to be $22,777.50 more than they actually were. In June, 1877, the Auditor caused an examination to be made of the affairs of the company, and when the examiner was ready to trace the securities through the company's cash book, to see whether the company actually owned the securities it claimed, the secretary of the company suddenly disappeared and absconded. It appeared that the value of the assets of the company was $196,685, the liabilities $344,857, including net present value of policies on four per cent basis, showing a deficiency of assets of $148,171.58.

It is attempted to mitigate this unfavorable showing of the financial condition of the company in various ways. As the securities before mentioned stood in the name of the company, the legal title appearing to be in the company, it is claimed that they ought to ·be regarded as assets of the company. The company had paid nothing for them, and they were not actually the property of the company. It would appear that they had been so taken in the name of the company with the expectation of their becoming its property when it might afterward be in funds and pay for them. They were not *bona fide* assets, and the exhibiting of them as such in the company's reports to the Auditor was deceptive to ·him, to persons taking insurance, and to the public.

Evidence was introduced that the good will of the company was of the value of $100,000 or $150,000, and it is claimed that this should be counted an asset of the company. The good will of the company would be a poor species of assets to pay losses with, and it is funds which will pay losses, that an insurance company is required by law to have.

The examiner of the condition and affairs of the company, appointed by the Auditor, made report, containing among

"liabilities" this item : "Net present value of policies, actuaries 4 per cent, $333,276," and appended to the footing of liabilities was, "leaving an impairment of $148,171.58. The impairment, on the American six per cent, or commercial, basis, would be $75,205.58." The reason or significance of this last clause appearing in the report is not apparent, but the company's counsel takes advantage of this, and insists that the estimate should have been on the last named six per cent basis, so greatly lessening the deficiency of assets as estimated on the four per cent basis.

Section 10 of the general act for the regulation of the business of life insurance, approved March 26, 1869, Revised Statutes 1874, p. 604, provides as follows : "When the actual funds of any life insurance company doing business in this State are not of a net value equal to the net value of its policies, according to the 'combined experience,' or 'actuary's' rate of mortality, with interest at four per cent per annum, it shall be the duty of the Auditor to give notice to such company, and its agents, to discontinue issuing new policies within this State, until such time as its funds have become equal to its liabilities, valuing its policies as aforesaid."

The four per cent basis prescribed by this law must certainly govern, and the impairment of the assets of the company upon this basis, instead of on the "American six per cent, or commercial, basis," must be taken as showing the deficiency of assets. The legislature, in the protection of the public, might to that end well prescribe what amount of assets and degree of solvency an insurance company should possess, and on what basis it should be estimated. It would be a proper exercise of the police power. The validity of such a provision is sufficiently vindicated by the principles laid down in the *Ward case*, and further remark thereon is not required. This company is subjected to the operation of this law by the acceptance of the amendment to its charter, before adverted to, made February 21, 1867.

In this connection may be noticed the point made, that this general Insurance law has prescribed what shall be the penalty for a deficiency of assets, to-wit: that the company shall discontinue issuing new policies, until such time as the funds of the company have become equal to its liabilities, and a disregard of that provision by any officer or agent is made punishable by a fine not exceeding $1,000. It is insisted that this is exclusive, and must be the only consequence of deficiency of assets. This general Insurance law was passed in 1869. It would surely be competent for a subsequent legislature, in 1874, to prescribe another and different penalty and remedy, and such proceeding as the act of 1874 authorized to be taken may be resorted to, whatever be the law of 1869. Insolvency is one of the causes named for the proceeding under the act of 1874.

It is said, on behalf of the company, that as soon as the impairment of the assets of the company was discovered, the company proposed to the Auditor to effect a re-insurance of all the outstanding risks of the company, and it is claimed that should be taken as making up any deficiency of assets. The evidence is vague as to any offer of re-insurance. It is found in the testimony of the examiner, who, after first stating as his recollection that there were two offers made to re-insure all the risks of the company in some company satisfactory to him, then proceeds: "My recollection is, that if I communicated with the Auditor with regard to re-insuring those risks, it was on a proposition made by some other company to do what we call 'twist' the policies,—not for the company to re-insure all of its risks at once, but to give another company the privilege of coming in and issuing new policies of its own to each individual policyholder, on such terms as they could make with the policyholders themselves, and take their pay out of such assets as they might choose of the company. I think there was a proposition of that kind made, and I think it was refused, either by myself or after

communication with the Auditor." The real ground of complaint would seem to be that the Auditor proceeded in the precise course pointed out by the statute, and did not go outside of the line of his duty, and stop to negotiate and bargain with the company. We can not make out of this alleged offer of re-insurance anything which should be held as a defence to this proceeding, or be taken as making up the company's·deficiency of assets.

As the matured liabilities of the company, at the time of commencing the Auditor's suit, did not exceed $8400,—which could be paid on demand,—it is contended the company was not insolvent, and authorities are cited to the effect that when a debtor is able to meet all his engagements as they become due, in the ordinary way, he is solvent. It is a higher standard of solvency than this which our law requires of insurance companies. The general Insurance law, before referred to, directs that when the actual funds of any life insurance company are not of a net value equal to the net value of its policies, according to the mode of valuation there named, the Auditor shall notify the company to discontinue issuing new policies, until such time as its funds have become equal to its liabilities, valuing its policies as directed. This is an expression of the sense of the legislature of the degree of solvency a life insurance company should have, and it requires its assets to be equal to the amount of its liabilities,·whether due or not. We think the company was insolvent, within the purview of the Insurance law.

The point finally made is, that all there was of wrong in the management and condition of the company is to be laid to the charge of the secretary of the company alone,—that all the other officers and agents of the company had acted in good faith, and were guiltless of any wrongdoing, and hence it should be taken that there was no willful default on the part of the company, and it should not be subjected to this

proceeding.  The company could act only through its officers and agents, and should be held responsible for the acts of, and mode of management by, its secretary, and the result therefrom.  It is the management and condition of the company, rendering its continuance in business hazardous to the public, which entitles to this proceeding, without regard to what one or how many of the company's officers participated in the mismanagement or the bringing about of such condition.  The public should have the protection which the law has provided against the unsafe doing of business by insurance companies.  The hazard to the public is the same whether one or more of the company's officers were concerned in producing it, and whether or not it resulted from the willful default or misconduct of the company.

We can not say that the court below was not justified in finding from the evidence that the condition of the company was such as to render its further continuance in business hazardous to the insured therein, and to the public, and the decree will be affirmed.

*Decree affirmed.*