## DENIAL OF RECEIVER FOR LIFE INSURANCE COMPANY.

Superior Court of Cincinnati, Special Term.

WALTER L. BENSON ET AL V. THE COLUMBIA LIFE INSURANCE COMPANY ET AL.

Decided, April, 1908.

*Receiver—Share-holders and Policy-holders of Life Insurance Company not Entitled to Appointment of, When—Evidence Required to Sustain Application for—Construction of Section 274—Death Claims not Unconditional Promises to Pay—Insolvency in the Strict Legal Sense and Under the Insurance Laws—Past Mistakes —Internal Policy—Fraud and Waste—Doing Business "Unlawfully."*

1. A receivership is a harsh and extraordinary remedy and a court of equity when considering the remedy will look to the equities of the entire case as well as the mere technical legal rights of plaintiffs.
2. Past irregularities afford no ground for the appointment of a receiver. Nor do present irregularities or mismanagement unless accompanied by *actual fraud.*
3. There being no action for a receivership, no receiver will be appointed unless the remedy is ancillary to some other ultimate equitable relief and where necessary to make that other relief effective.
4. If dangers threaten due to irregularities and acts, *constructively* fraudulent, no moral turpitude being involved, and if such dangers can be effectively prevented by some other remedy, as for example, injunction, no receiver will be appointed.
5. Section 274, Revised Statutes, confers powers and duties on the superintendent of insurance and is primarily for the benefit of the public; it confers no power in the first instance, at the suit of a share-holder or policy-holder, upon a court of equity, to enlarge its jurisdiction to wind up the affairs of an insurance company.

*Worth E. Taylor, Cogan & Williams, Kinkead, Rogers & Ellis* and *W. H. Parkinson,* for the motion.

*Province M. Pogue, C. Bentley Matthews, Thomas B. Paxton, Sr.,* contra.

HOFFHEIMER, J.

This matter came on to be heard on the motion of plaintiffs for the appointment of a receiver: The petition is voluminous, and the charges that are made the basis of this action cover some twenty pages of typewritten matter. Plaintiffs represent some thirty shares, as against seventeen hundred shares of stock, and they likewise hold $27,500 worth of life insurance as against some $4,600,000 now outstanding. Plaintiffs claim they sue on behalf of themselves and all other stockholders, policy-holders and creditors, although it is not evident to the court that any stock-holder, policy-holder or creditor other than these plaintiffs evince any sympathy with the claim of plaintiffs, or join in this request for a receiver.

The directors and executive officers of this company who stand charged with mismanagement and fraud (constructive at least), are on the whole men of probity and excellent business reputation. Almost all of them, on being apprised of the charges here made, promptly and vigorously protested against the appointment of a receiver, and they assert that a receivership would not redound to the best interests of the share-holders and policy-holders.

The plaintiffs themselves did not appear at any time during the extended hearing of this motion, save by counsel, and the principal actor on behalf of plaintiffs, the court could not help but observe, was Mr. Moore, one of the company's general agents and partner of Mr. Carl Hansen, who has instituted suit at Chicago to rescind a contract of purchase of this company's stock (a deal involving $160,000) and whose interests it will thus be observed are not inconsiderable.

The testimony shows that Mr. Moore was equally involved in the $2,000 transaction with Sumner Cross—a transaction now complained of by plaintiffs, facts which although they ought not to prejudice any rights of these plaintiffs, nevertheless should be borne in mind in considering the entire case and this application for receivership.

The testimony also shows that Mr. Moore has been a constant fault finder (see testimony of James Albert Green, director),

*not, however, with the conduct or acts of the board or execu-tive officers* but with the president, Felix G. Cross (see particu-larly his letter to C. B. Matthews, January, 1908), and his one endeavor has been, for reasons entirely disassociated with the charges here made, to have said Cross removed from the presi-dency of this company.

The Columbia Life Insurance Company is a young company and is passing through, what seems from the evidence to be, the common experience of all new life insurance companies. It appears that life insurance companies are of slow growth; that the expense of procuring new business is heavy; and that the expense of securing new business for this company does not ex-ceed the expense of securing new business in all ordinary life insurance companies. While it appears that the expense of securing new business has increased for the fraction of the year up to this hearing, the $5,000 death loss referred to in Hyde's letter to Matthews April 9, 1908, would seem to have been taken into consideration in figuring the increase, and affords explana-tion thereof.

The business of the company, however, while not as satisfac-tory as might be desired, as was substantially testified to by Director Green, has never had a year wherein it has not made some forward stride with reference at least to procuring new business, as the following table shows. Insurance in force at the end of the year: 1904, $2,661,405; 1905, $2,922,026; 1906, $3,527,309; 1907, $4,607,276. If any percentage of this is re-insurance the testimony of the actuary that re-insurance under mutual arrangement is valuable is not overcome.

True the company does not appear to have made any *net earnings* up to date, but it ought not to be overlooked that the insurance that has been obtained by the expenditure of the com-pany's money is a very valuable asset in the *ordinary* sense of the term at least, and this is worth, according to the evidence, thirty-five or forty dollars a thousand. This item, then, should certainly be remembered in considering the practical solvency of the company, and when considering the rights and interests of all the policy-holders and share-holders.

I have adverted at the outset to these matters generally, because in considering the technical legal rights of plaintiffs it is proper that the court have in mind also the rights of all interested in this property. Nothing is better settled than that courts of equity act with great reluctance and caution in the matter of appointing receivers. In *Baker* v. *Fraternal Mystic Circle*, 32 W. L. B., 84, 86, it was said:

"In the whole armory of equity jurisprudence, one of the most formidable weapons is a receivership. When there is a contest, a very strong case, a case which upon the facts stands out in persuasive clearness, must be proved before this weapon will be drawn."

And the greatest circumspection is to be employed in the exercise of the discretion, and this is not to be influenced by the technical legal rights of the parties but by the equities of the entire case. *Ibid*, p. 82.

Aside from the technical legal rights of plaintiff can there be any doubt as to what a receivership would mean in this case to all the others interested?

The appointment of a receiver would render all the outstanding insurance valueless (plaintiffs' admission by brief). This insurance is worth, as stated (and this is uncontradicted), thirty to forty dollars a thousand—an ordinary asset of $160,000 to $170,000.

If it be true, as plaintiffs claim, that the witness who gave this testimony is not expert, it is just as true that the court, in the absence of testimony to offset that claim, would be less warranted in substituting any opinion of its own. A receivership, then, would not only mean a loss to the stockholders of this valuable asset, but the property would be taken out of the hands of its statutory officers, designated by the vast majority of the stockholders, and the *corpus* would be placed in the hands of strangers to administer, thus saddling the remaining assets with the usual heavy expense incident to that mode of administration. *Havemeyer* v. *Sup. Ct.*, 84 Cal., 369; *Robinson* v. *C. C. R. Co.*, 5 N. P., 305.

It would spell the immediate ruin, collapse and the enforced

winding up of this corporation. Indeed counsel for plaintiffs so understand it, and with characteristic frankness assert (I do not undertake to quote *in totidem verbis*), "That this company is dead; that it is better for this court to wind up the corporation than to permit the recreant board to do so, or to permit the insurance commissioner to do so, as they may and must, if the relief here asked shall be denied."

But, if the winding up of this company is the ultimate relief sought, and it appears that such relief can be afforded at law, then there is no room for the special remedy of receivership. Alderson on Receivers, Section 7, pp. 10, 11; High on Receivers, Section 301, p. 261.

Bearing in mind, then, that the appointment of a receiver would signify the immediate collapse of this enterprise, which if left alone "would be an ornament to the city" (James Albert Green, director), and would be for the best interests of the stock-holders and policy-holders (protest of nineteen directors), what grounds are urged for the application of this harsh remedy?

It would be impossible save in a somewhat general way to discuss all the complaints set out in the petition. Some of them, namely, misrepresentation and the charge as to rebating or the making of secret profits in contracts of printing and supplies, are utterly unsupported by evidence. The charge that F. G. Cross profited by deals in stock is not proven. A number of charges cover things done in the past. If there were delinquencies in those particulars, they are closed transactions. Many things complained of are freely admitted to have been done, and there is express avowal that there will be no repetition of these matters in the future. Nor does the evidence warrant the court in believing that there is any immediate or apparent danger that this word will not be kept, or that similar delinquencies will occur or threaten to occur. Judge White speaking for the court in the Sloan case (31 O. S., 7), said:

"A provisional receiver is in effect an injunction and something more stringent still. It is to be granted with great caution and only in case of pressing apparent necessity."

Citing Edwards on Receivers, 13.

And in 5 Pom. Eq. Jur., Section 64, it is said:

"Past and remote dangers are not sufficient to invoke the power of appointment. And past transactions are not sufficient to warrant the practical winding up of a corporation." *Ibid*, Section 121, p. 214 and note 271.

And in *North Fairmount Building Company* v. *Rehn*, 6 N. P., 193, Judge Rufus B. Smith of this court said:

"It seems to us quite clear that these acts would not justify throwing the association into the hands of a receiver, or even of issuing an injunction against the directors. First, because the acts, even if illegal, as to which we express no opinion, were done in good faith and were free from all taint of moral turpitude. Second, because they have been abandoned and there is no intention or threat that they will be repeated."

The discounting of agents' notes, taken for advances in several instances, and turning the proceeds into the coffers of the company, are past transactions and nothing similar is threatened. It may be noted, also, they involve no liability on the part of the company.

If Sumner Cross realized profit from buying or selling of small blocks of stock, it will be noted that he was not a member of the board or executive committee. While the court, however, is not to be understood as approving those transactions, nevertheless they are past and nothing similar seems to threaten.

The McLain, Lee, Bradford Shinkle small stock transactions were isolated transactions, occurred in the past, and in all of this I see no ground for a receiver.

Some commissions were paid Sumner Cross on insurance. In obtaining this insurance he seems to have been aided by his father, the president of this company. All of this, however, seems to have been done prior to February or March, 1907. The evidence shows that prior to those dates Sumner Cross was employed at a very small salary. The agreement called for half his time, and, under a fair construction of the contract, he could write insurance and earn commissions when not otherwise at work for the company. After the date mentioned, however, he was given an increased salary and he was to earn no commissions.

The evidence fails to show that he received commissions on new business from March, 1907, down to the time of this hearing. Those transactions, in any event, are past, and even if they involved any wrong, it will be observed that this very board, now complained of, voluntarily put a stop to such transactions.

It is true the "book of rates" fixed by the president established no rate beyond the age of sixty years. Nevertheless, when the company was organized Dr.. Cross, desiring to be of the first to have a policy in this company, "called the attention of the committee or board to the age" (testimony of Dr. Cross) and by and with the full consent of the executive officers he was authorized to take out a policy, although he had reached the age of sixty-one.

But the rate at which he took the policy was according to recognized standard rates, and I see no reason why the board of directors, in whom is vested the executive management and control of the business and its policy, could not exercise their judgment in what seems to be a plain business proposition and take this risk, if it were otherwise deemed a good risk, and there is nothing to show that such was not the case. Moreover, this was not an exceptional case. Policies seem to have been issued to others, over sixty, notably in the case of Clasgens, concerning which no complaint is now made.

The commissions paid Sumner Cross on the Meyers policy was an irregularity. It seems to have been the only transaction of its kind, is past, and nothing similar threatens the rights of these plaintiffs.

The payment of $2,000 to Sumner Cross (not a member of the board or executive committee), by Mr. Moore (general agent), was a wrong on the part of both these individuals.

But I can not understand that Mr. Moore was not entitled to the money in the first instance, and the action of the board, on discovering the facts, is evidence that there was no moral turpitude on its part. If there is any fault to be found with the managing officers it is, that some drastic steps were not taken in regard to both individuals.

Nor am I willing to say that the *quantum* of evidence neces-

sary to connect F. G. Cross with this deal is present. In any event, I am at a loss to understand how this transaction, wrong as it was, affects or threatens the rights of these plaintiffs.

The claims in regard to failure to pay dividends and the claim as to lapses, seem to be matters largely of internal management. If another board can do better, the share-holders hold the remedy in their hands.

Equity will not concern itself in such matters, unless it *clearly* appears that positive misconduct and waste were the direct causes. I can not say that the evidence justifies any such finding.

There are some other charges which I do not stop to mention. They are of a minor character, and they fall in the category of past transactions; they no longer threaten; and in no instance do they involve bad-faith on the part of the managing officers.

Plaintiffs themselves, in the argument, practically ignore them, laying particular stress however upon certain transactions, which, though in a sense past, it is urged are *present and continuing* and threaten the rights and interests of plaintiffs. I refer now to the Interstate transaction; the Matthews transaction; the so-called special deposits; the Hansen claim; the death claims.

Before taking up these matters, turning to the prayer of the petition, we find it couched as follows: ·

"Plaintiffs pray that a receiver be appointed by this court to take immediate possession of the assets of this corporation with the usual powers; that the Columbia Life Insurance Company may be enjoined from transferring or otherwise disposing of its property or effects, and that it may be particularly enjoined from paying to said Felix G. Cross or his assigns the said amount of $34,500, illegally and wrongfully claimed by him from said company; that after paying costs of re-insurance the policy-holders of this company and all the debts of the corporation, the receiver pay over to plaintiffs and other stock-holders such surplus as shall remain in his hands."

If the injunction prayed for should ultimately be granted, this action would be one for a receiver only. And a receivership being a provisional remedy only, and there being no action for a receiver, this court would be without power to appoint a receiver

to practically wind up a corporation. *Cincinnati, Hamilton & Dayton R. R. Co.* v. *Duckworth*, 2 C. C., 518.

Particular attention may be called to the following language of Judge James M. Smith in *Cincinnati* v. *Duckworth,* which would seem to be applicable (p. 528):

"The fact therein stated, that the former officers of the company have so fraudulently conducted its affairs as to cause great loss to it, and probably render it insolvent, and which had been negligently permitted by three of the present directors, while there was no pretense or claim that the present board, a majority of whom had no connection in any manner with such fraudulent acts, were not now conducting the business with the greatest wisdom and skill, obviously did not entitle the plaintiff, as a share-holder, to have a receiver appointed as prayed for, to take the possession and management of the defendant's railroad, and of all its business and affairs, simply that he might state an account thereof, and of the finances of the company so that if it were necessary to sell, the court might so order, and make distribution of the proceeds according to law. This makes the appointment of the receiver the primary and principal object of the suit, and not an ancillary process of the court, necessary to effectuate some other relief prayed for."

And again at page 532:

"The difficulty which presents itself to us is this: Do the facts as found, or the evidence in the case, show any necessity whatever for a resort to this extreme measure? Were any good reasons disclosed in either, to render it at all probable that the present board of directors would not at once, and in good faith, obey an injunction against them as actually entered by the court? If it be admitted that they have erred in judgment in the purchase of these claims against Ives, and the collaterals attached thereto, and have done that which the law forbids in such purchase (and this is all that is found, and there is nowhere any finding of bad faith on the part of the directors in such acts), and the court enjoins them from such acts in the future, and forbids the payment, from the assets of the company, of obligations already contracted therefor, what is there in the case to raise the presumption that the order will not be obeyed? We are not able to see anything which will justify such an opinion. On the contrary, the fair and strong presumption, in the absence of anything suggesting the contrary, would be, that these directors, to

which the stockholders in this time of trial and peril, with knowledge of the facts, have entrusted their interests, and who are shown beyond all controversy to be men of great sagacity and wisdom in business affairs, and who apparently are justly entitled to the confidence of the community in which they live, several of whom have in time past been connected with the management of the affairs of the company in the time of its highest and most extraordinary prosperity, and who are now well advised as to its interests and all of whom appear exceedingly diligent in their efforts to bring about a better condition of things, would, as good citizens, obey any order the court might make, even if in their efforts to aid the company they have gone further than they should have done.''

See, also, that the receivership must be ancillary to some other equitable relief. *Rapp* v. *Relief Co.*, 10 C. C.—N. S., 575.

Plaintiffs suggest, however, that they may amend their petition, and ask for such other general equitable relief as the case may warrant (*Draper* v. *Moore,* 2 C. S. C. R., 167), and it is intimated that an accounting may be necessary. This, however, would seem to fall within reasons given in the Duckworth case, *supra,* at page 528.

It is furthermore contended that a receiver would be necessary to make the injunction effective if that relief is to be granted. In short, that there has been such gross mismanagement and fraud (legal) that when the assets are compared with the liabilities, as a net result of the transactions above referred to, there is a deficiency of forty per cent; and if not that, of from twenty to forty per cent., in which event, it is claimed, the company is insolvent within the purview of the insurance laws of the state and so incapacitated from further transacting business; and further that the company is actually insolvent in the strict legal sense. That the court will therefore not only enjoin the illegal acts, but since it is evident the business can not go on, that it will appoint a receiver to make the injunction effective, and conserve the assets for the benefit of the shareholders and policy-holders.

This court has already determined that mere mismanagement is a thing that can be regulated by share-holders themselves

within the corporation, and that unaccompanied by fraud it is not sufficient to warrant a receiver. *Goebel* v. *Herancourt Brewing Co.*, 7 Nisi Prius, 230.

In the Rehn case, Judge Smith pointed out that where the acts complained of were free from moral turpitude there could be no receiver. *North Fairmount Building Assn.* v. *Rehn*, 6 Nisi Prius, 193.

In view of these authorities, and the facts in this case, cases to which I have been cited by plaintiffs, involving acts of moral turpitude on the part of the directors, or the looting by them of the corporation, or where it was manifest that there was danger of instant loss notwithstanding an injunction (exception referred to in the Duckworth case), or where the corporate business was abandoned, or was being carried on contrary to the purposes of the charter, or in contravention of law, or illegally, are not applicable unless by analogy where, as is claimed here, that the past and present fraudulent (constructive) acts of these managing officers have absolutely incapacitated the company to the extent that it can no longer carry out the objects for which it was incorporated, and that no future is apparent for the company.

From what has already been said, it is manifest that this is not a case involving actual fraud, or looting, or abandonment, or attempt to carry out an illegal purpose, or an attempt to do an unlawful business. Indeed, actual fraud is expressly disclaimed. While the evidence, it is true, shows some irregularities, nothing appears from which the court could say otherwise than that the board of directors and the executive committee were always actuated by the best motives and for the best interests of the company, though they may have made mistakes in judgment and may have even undertaken to act illegally, on which I now express no opinion.

But what does the testimony show as to the claims of mismanagement and fraud (legal)?

(a) Have the managing agents by mismanagement and fraud rendered this company insolvent under the insurance laws to the extent that they are no longer able to carry on the business?

(b)   Have they rendered the company insolvent in a strict legal sense?

The first proposition involves a consideration of Section 274, Revised Statutes of Ohio.

"When it appears to the *superintendent*, from examination, or otherwise, that the assets of any insurance company organized under the laws of this state, after deducting therefrom all liabilities, including reinsurance, reserve or unearned premium fund computed according to the laws of this state, are reduced twenty per cent. or more below the capital required by law, he shall require such company to restore such deficiency within such period as he designates in such requisition. In case such deficiency is more than forty per cent. of the capital required by law, it shall be unlawful for such company to issue any new policies or transact any new business until the superintendent of insurance issues to such companies a license authorizing it to resume business, or until the court has rendered its decision in the case as provided in section two hundred and seventy-six, Revised Statutes. In case such deficiency is more than twenty per cent. and less than forty per cent. of the capital required by law and the officers of the company certify that the deficiency will be restored by the company, then it will be lawful for the company to continue business as before the issuing of the requisition for the term of thirty days from the date thereof, and if at the expiration of the thirty days any portion of the deficiency is not restored, the company shall not issue any new policies or transact any new business until authorized by the superintendent, or until the court has rendered its decision in the case as provided in Section 276, Revised Statutes."

It will be observed that this section does not confer any authority upon a court of equity to wind up the affairs of the corporation. The section is found in the chapter relating to the duties of the superintendent of insurance and its cardinal object seems to be protection to the public (see Section 275).

It will be observed, further, that this action is not instituted by the insurance commissioner, or superintendent of insurance, but is an action of share-holders and policy-holders (creditors).

I find no authority whatever justifying the usurpation by share-holders, policy-holders or creditors of this statute on an application of this character, to enforce the practical winding up

of the company, and I do not think a court of equity is warranted by any of the provisions of said section, in enlarging its jurisdiction (Morawetz on Corporations, Section 657, first edition; Cook on Stockholders, Section 629, second edition; High on Receivers, Section 288, second edition), to wind up a corporation, in a suit by the share-holders or policy-holders.

Section 274, Revised Statutes, gives a remedy *at law* for the abuses therein referred to, and it prescribes the particular *legal* remedy that is to be pursued. That the superintendent of insurance is the proper party to start Section 274 in motion, see *Ward* v. *Farwell*, 97 Ill., 615, 616.

Nor is *Richardson* v. *People's Life and Accident Co.*, 92 S. W., 284 (Ct. of App. of Ky.), to which I am cited by plaintiff's authority, to the contrary. In that case the court simply held the policy-holder was not compelled to wait until the official designated by a similar statute had proceeded. Enough is set out in the bare statement of the facts in the Kentucky case, to show that the creditors were amply justified in invoking the equitable power of the court, *independent* of the statute, and the *ratio decendi* was, that the creditors in the equity proceeding who first applied for a receiver, were not to be precluded because the Attorney-General subsequently proceeded under the statute.

It would thus seem that Section 274 ought to be eliminated from further consideration. Even if this were not so, appreciating as I do, that the word "liabilities" as used in that act is not synonymous with the word "debt" (*Lally* v. *Farr*, 6 Ohio Nisi Prius, 76), still I have very grave doubts whether a court of equity called upon to exercise its discretion (in an action in which the public is not presently concerned, but in which the court is concerned with the best interests of *all* the share-holders and policy-holders) should interpret that term in the broadest possible sense and construe it to include the most contingent of liabilities. In any event, in an action of this character if a reasonable defense appears and such is shown here, the claim ought not be regarded as a liability.

To adopt the very broad construction urged by plaintiffs (it is pointed out that the amended statute omits the word "actual,"

leaving the word "liability" to stand alone) would put it within the power of a disgruntled and disappointed share-holder, by the mere assertion of a pretended claim, supported by evidence however flimsy, providing only the claim were made sufficiently large, to render insolvent *on mere figures* the most solvent company in the world *on stubborn facts* and thus throw it into the hands of a receiver and wreck the enterprise.

The doubts I have as to the application of Section 274 and also as to the construction sought to be placed on the word "liabilities" by plaintiffs are sufficient to cast out the Hansen claim (growing out of the Chicago suit and amounting to about $65,000, including interest) as a liability and practically all of the other alleged "liabilities."

As was said by Judge Pugh in 32 W. L. B., p. 86:

"If plaintiff's counsel are sound in their interpretation of the term 'expenses,' $8,300 of the mortuary fund has been used during 1893 and 1894 to pay expenses. But there is a consideration which casts some doubt upon the soundness of their construction, and that would be enough to defeat the application for a receiver on this ground. It is not necessary to demonstrate that they are wrong in their interpretation; a *doubt* is enough."

Having thus eliminated the Hansen claim, the liabilities, if any, are certainly below the alleged forty per cent. clause referred to in Section 274. It is claimed that there were *certain special deposits*, namely, $5,900, $9,200, $10,800, and that these were liabilities and debts of the company.

The testimony with reference to these alleged deposits, however, proves nothing of the kind. Plaintiffs themselves in brief admit that the testimony in regard to these so-called debts is not clear, but a court of equity will not grant a receiver unless a case of "persuasive clearness is proved" (*Baker* v. *Fraternal Mystic Circle, supra*), or unless one's claim of right is reasonably free from doubt. Alderson on Receivers, Section 7, pp. 10-11.

Reading the testimony of Mr. Luken I find nothing from which I could say, with positiveness, that the sums of $5,900, $9,200 and $10,800 are liabilities or debts in any sense. On the contrary, I think I am justified in saying that the evidence fails to show anything due and owing on such account.

In regard to the C. B. Matthews transaction, I fail to see how the Norwood Bank, which holds the note of Mr. Matthews, can look in law to any one save Mr. Matthews for its payment, and I do not think it is contended that it does look to the company. But plaintiffs ask me, as I understand it, as a substitute' for proof, to invoke a recognized equitable principle and look through form to substance and declare this $6,300 transaction a debt of the company.

I take it, however, that it would not be looking. to the equities of the entire case, and that it would not be subserving the best interests of all to saddle upon all, if only for the purpose of this hearing, a debt which Mr. Matthews owes, acknowledges, and which he alone is legally obligated to pay.

If a commission ($80) has been paid Blanton, on this transaction, and the evidence shows such is the. fact, or, if the interest has been paid on this amount by the device of special salaries, and the evidence shows such is the fact, there is a way, I think, to recover these amounts, without the intervention of a receiver. I think, however, this intimation will suffice to deter further payments of interest on this Matthews transaction, although I understand, under the evidence, that nothing has been paid thereon since January 1st, 1908.

As to the death claims, the policies under which same are claimed, are not *unconditional* promises to pay.

There seems to be reasonable grounds according to the evidence for resisting those which are not paid. Some of these policies appear to be reinsured and consequently their liability to such extent is reduced *pro tanto*.

Another policy is covered by collateral, and in still another case the defense is that the policy lapsed before any legal claim thereon could have matured, and another policy is resisted on the ground of fraud. All of this appearing, I do not see how they afford any ground as debts or liabilities to declare a receiver necessary, especially, since it appears that the *surplus* at the end of December, 1907, was in excess of the total of such claims, provided, however, that the sum involved in the Interstate transaction is neither a liability nor a debt of this company.

Now this transaction grows out of the taking over by this company of about one million and a half of the Interstate Company's insurance.  This was done or attempted to be done in the formal way prescribed by statute; whether the transaction was legal or not, I do not now determine.  The agreement, Exhibit 15, *inter alia* recites:

"It appears to said commissioner that the payment by said the Columbia Life Insurance Company to the said Interstate Life Insurance Company of $25 per $1,000 on insurance of said the Interstate Life Insurance Company, in pursuance of said contract, would impair the capital of $100,000 of the Columbia Life Insurance Company.  Thereupon said Felix G. Cross submitted to said commissioner a paper writing, certifying that none of the assets of the said the Columbia Life Insurance Company would be used in payment of any sums to be paid under such contract by said the Columbia Life Insurance Company to the said the Interstate Life Insurance Company; that all funds required to pay the said the Interstate Life Insurance Company in carrying out the said contract will be advanced by the said Felix G. Cross to the said the Columbia Life Insurance Company without any liability of said company to him for such advancement, but with the expectation of reimbursement to him only from surplus contributed to the said the Columbia Life Insurance Company by persons, whom in the future may purchase stock in such company which said paper writing is hereto attached, on condition that none of the assets of the said the Columbia Life Insurance Company shall be paid to said the Interstate Life Insurance Company, and on condition that funds necessary to pay the said stipulated price of $25 per $1,000 of insurance in force will be paid as aforesaid by said Cross, the said contract of reinsurance is by said commissioner hereby approved, subject, however, to the following modifications:

"Said the Columbia Life Insurance Company shall be directly liable at the suit of and to the policy-holders of said the Interstate Life Insurance Company upon any and all claims arising under the policies of the said the Interstate Life Insurance Company for which the said the Columbia Life Insurance Company may be liable under such contract."

Dr. Cross advanced the necessary $40,500 without any liability to the company, and the company received a very valuable asset in the Interstate business.

Now, the directors realizing this company acquired the benefit of the Interstate business and believing the Cross advance to be a moral obligation of the company, undertook in good faith by a method called "special salaries" to reduce the amount of this advancement to $34,500 (exclusive of $2,000 Sumner Cross commission, and with regard to which sum I do not understand how plaintiffs can complain).

They voted special salaries to certain officials and they applied the amount so voted on this advance as part payment. While it is conceded by plaintiffs that the amount voted to each officer added to the actual salary now received by such officer, does not render the particular official's salary excessive, nevertheless, in view of the contract above referred to, I do not think this action of the managing officers was proper even if the directors believed in good faith that it was the proper thing to do. It was an evasion of the conditions of the contract which permitted the taking over by the company of the Interstate business, and that advance of Cross, if it is to be paid at all, must be paid in the manner therein specified and in no other way. But shall this court in the exercise of the discretion invested in it be guilty of the same wrong, and undertake to circumvent the provisions of that agreement by declaring this $40,500, or as it now stands $34,500, to be a liability or debt of the share-holders —of this company—merely because of some allegations in one part of the answer of these defendants by which it seems to be admitted that this is a debt, although in another part of the same answer it is unequivocally stated that it is an indebtedness of Cross? Or shall I declare it a debt or liability merely because the executive committee "deemed it wise to pay it" and issued a check therefor (January, 1908), subject to the approval of the board, which check, however, the board of directors promptly refused to pay and ordered canceled?

Once before in the history of this company some $9,000 on account of this advance was paid by a method other than that contemplated by the agreement referred to. The insurance commissioner became cognizant of the fact. Did he with the interest of the public in mind regard the entire $40,500 as a ma-

tured debt or a liability? Certainly not. He simply did what he doubtless will do again with reference to the amount advanced as special salaries. He ordered the $9,000 paid back, and it was paid back.

Plaintiffs in this case earnestly pray that the company be enjoined from paying Felix G. Cross or his assigns $34,500 illegally and wrongfully claimed by him from said company.

But in the argument on this motion they ask me to consider it as a debt or liability and to hold the capital stock impaired *pro tanto*.

If the injunction should be granted as prayed for on the ground it was neither a liability nor debt, it would seem to me to be somewhat of a paradox if a receiver were to be appointed at this time on the ground it is a liability or debt.

Again, if I hold this to be a debt now, then surely there could be no ground upon which to order an injunction. In such event, what becomes of the argument that the injunction here is the ultimate relief, and that a receiver is necessary to make same effective?

Or if it be the argument of plaintiffs that because of the alleged admissions of defendant in their answer, and because of past and present fraud they fear the $34,500 will be paid by other devices and shifts, I would say, following the example of the circuit court in the Duckworth case, that this court is satisfied, considering the personnel of the board, that this will not be done pending the hearing on injunction. And if on hearing an injunction should appear to be necessary, and that remedy of equity would be sufficient to prevent the payment of the Cross advance (and there is no reason to believe such order would not be obeyed), it would not be necessary to appoint a receiver and practically wind up this company. 5 Pomeroy Equity Jurisprudence, 121, note 271.

But as nothing has been done by way of payment on this account since January of this year, and as no evidence is offered to prove that an attempt is about to be made to pay same, and as the evidence completely fails to show that Dr. Cross is pressing for payment, or that anything is due and payable thereon,

I see in this no "pressing apparent necessity" calling for the appointment of a receiver.

The capital stock and the legal reserve of this company is intact. The company has $4,600,000 business on its books. If this business is worth from thirty-five to forty dollars a thousand, as already pointed out, and this testimony is not denied, this is a very valuable asset and, in the ordinary sense of the word, the company makes a clear showing of solvency.

The actuary (Mr. Hyde) testifies that all the debts of the company have been paid as they matured in the ordinary course of business. This being so, this company is also solvent in the strict legal sense. *American Hosiery Co.* v. *Baker,* 18 C. C., 604; *Mitchell* v. *Gazzam,* 12 Ohio, 315.

The case of *Insurance Co.* v. *Auditor,* 101 Ill., 82-92, to which I am cited by plaintiffs, might be authority as to what constitutes insolvency of an insurance company under proceedings properly instituted under a section similar to 274, but has no application in a proceeding of this character.

As an additional argument on the company's inability to proceed, it is claimed that the company is now precluded by virtue of an Illinois statute from doing business in Illinois because of the removal by its attorneys of the Hansen suit to the United States Court. It may be that the facts may not bring the case within the terms of the statute, but I think I need only say now that this expulsion statute of Illinois does not seem to be automatic. The question is not yet determined, and therefore it does not appear that this company is already excluded from that jurisdiction, nor does it appear that it necessarily will be.

Nor does the fact, if it is a fact, that this company is not doing any new business because of alleged withholding of its license by the insurance commissioner, prove that the company can not or will not ultimately proceed, or that the company is doing business unlawfully.

If I may not consider the provisions of Section 274 with reference to determining "liabilities" as therein specified, then certainly I ought not consider a particular clause therein to support a finding to the effect that the company is doing business unlawfully.

I find nothing in the facts or in the law that would justify me in now saying that this company is doing business unlawfully. While the evidence discloses irregularities, as I have pointed out, I fail to find any substantial ground on which a court of equity having an eye single to the interests of everybody in this case can appoint a receiver as prayed for.

The application for a receiver is accordingly refused.