(No. 23536.—

THE PEOPLE *ex rel.* The American Bankers Insurance Company, Petitioner, *vs.* ERNEST PALMER, Director of Insurance, Defendant.

*Opinion filed April 24, 1936—Rehearing denied June 9, 1936.*

500

ORR, J., HERRICK, C. J., and WILSON, J., dissenting.

FISHER, BOYDEN, BELL, BOYD & MARSHALL, POPPENHUSEN, JOHNSTON, THOMPSON & RAYMOND, and BELLATTI, SAMUELL & ARNOLD, (FLOYD E. THOMPSON, H. PAUL SAMUELL, and DAVID A. WATTS, of counsel,) for petitioner.

OTTO KERNER, Attorney General, (JOHN B. HARRIS, and DAVID J. KADYK, of counsel,) for defendant.

Mr. JUSTICE FARTHING delivered the opinion of the court:

Pursuant to leave granted, the American Bankers Insurance Company (hereinafter called the company) has filed its petition for a writ of *mandamus* to compel the defendant, Ernest Palmer, the Director of Insurance of the State of Illinois, to recognize the validity of policy liens described in the petition and to take such liens into consideration in valuing the outstanding policies issued by the company, in accordance with the statutes of this State.

The petition alleges as follows: The company is a corporation organized and existing under the laws of this State providing for the organization of legal reserve life insurance companies. (Ill. State Bar Stat. 1935, chap. 73, par. 315, *et seq.*) The amended charter of the company provides that its corporate powers shall be exercised by its board of directors and that it shall have power, among other things, to issue policies of insurance upon such terms

and conditions as the board of directors may from time to time authorize, not inconsistent with the charter of the company and the statutes and constitution of this State.

The defendant is the duly appointed, qualified and acting Director of Insurance of this State, and as such director he is under the statutory duty to "annually make valuations of all outstanding policies, additions thereto, unpaid dividends and all other obligations of every life insurance corporation doing business in this State," (Sec. 10 of Life Ins. act of 1869, as amended; Ill. State Bar Stat. 1935, chap. 73, par. 331;) and if he "shall find, in the case of any company doing business under this act, that the admitted assets of a stock life insurance company in excess of the minimum amount of capital stock required under this act, * * * are less than its liabilities, including the net value of its policies computed by the standard of valuation established by this section, such department [director] shall give notice to the company of the amount of such deficit as determined by it, [him,] and shall require that the deficit be made good," etc.

The company had in force as of December 31, 1935, life insurance to the amount of $20,988,312, in policies held by 35,255 policyholders. Out of this amount $6,665,952 is made up of policies averaging less than $300 each, which are held by 22,768 policyholders who pay premiums weekly, and these premiums average nineteen cents per week. They totaled $201,907.57 in 1935. This is commonly called industrial insurance. It is the opinion of the company that if this business were interrupted for as much as thirty days the agency force necessary to its collection would be disrupted and the greater portion of this business would be lost.

Of the total insurance in force, $14,322,360 is written on policies which conform to the Standard Provisions act of this State. These policies are held by 12,487 persons, most of whom pay annual premiums. In 1935, for this

class of business the total premiums amounted to $322,-322.86, of which $230,441.21 was paid in cash, $84,577.71 by policy loans and $7303.94 by notes or dividends.

In 1935 policyholders were paid in cash $263,798.53, of which $180,271.51 was on death claims, $38,375.29 on matured endowments, $6625.25 on disability claims, $28,-219.94 by way of surrender values and $10,306.79 as dividends. The December 31, 1935, balance sheet is attached and made a part of the company's petition. The value of the outstanding policies on December 31, 1935, was $4,539,-048.68. This is also called the reserve and is a liability of the company. No deduction is here made on account of the waivers or liens executed by policyholders. These waivers were executed by nearly one-half of the holders of the larger policies, written on the annual premium basis. They amount in the aggregate to $1,004,449.51 and are for fifty per cent of the reserve in each instance, applicable to the policy of the policyholder who executed the waiver. The company kept the Director of Insurance informed as to these waivers or liens both as to their existence and amount, showed them as assets in its balance sheet as an offset to its total reserve liability, and it notified the Director of Insurance that it intended to show them either as assets offsetting reserve liabilities or as a reduction of reserve liabilities in the tabulation of such liabilities,. in its financial statement due March 1, 1936. The company has requested the defendant, in computing the value of its policies under section 10 of the Life Insurance act, to give effect to these waivers or liens as a deduction from the reserve liability of the respective policies whose holders have assented to such waivers or liens, and thereby to reduce the reserve liabilities by the amount of said waivers or liens.

On January 10, 1936, the defendant wrote the company a letter relative to the "so-called voluntary liens." He stated that there had been considerable correspondence and several conversations between himself, as Director of

Insurance, and the company, and that he had been advised that the company had more than $800,000 in liens which it had advised him it contemplated setting up in its statement as an asset to determine its solvency. The defendant called attention to an opinion of the Attorney General of this State rendered on March 7, 1935, and another such opinion rendered on July 18, 1935, and advised the company that in view of these opinions his department could not, under the law, consider the voluntary lien values either as an admitted asset or as a reduction of the reserve liability of the company, and that if such values were shown in the company's annual statement to be filed before March 1, 1936, either as an asset or as a reduction of liabilities, the report would not be considered sufficient under the statute. He also advised the company that the State Insurance Department would not in any respect give consideration to such "voluntary liens" in the computation of the reserve liabilities or policy values which that department is required to compute by section 10 of the act under which the company was organized and authorized to do business, viz., "An act to organize and regulate the business of life insurance," approved March 26, 1869.

The petition continues: Early in 1934, upon the filing of the company's annual report for 1933, at which time the amount and character of insurance in force was substantially the same as above described, the defendant suggested to the company that the value of certain of its assets had depreciated as a result of adverse economic conditions, and that unless new assets were obtained from some source, it might develop, upon a complete appraisal, that the company was insolvent under the definition contained in section 10 of the Life Insurance act and subject to receivership proceedings under the provisions of the Insurance Companies Liquidation act of 1925 as amended. Ill. State Bar. Stat. 1935, chap. 73, par. 105, *et seq.*

The company, its officers, its policyholders and the defendant had before them the facts as to the experience of

such Illinois legal reserve life insurance companies as the Illinois Life, National Life of U. S. A., Peoria Life and Victory Life, the Security Life, a Virginia company having its principal office in Illinois, and of four named companies in neighboring States. In the years 1932, 1933 and 1934 those nine companies named had failed to meet impairments in assets and each of them had been placed in receivership either in the courts of Illinois or the Federal equity courts, with the result of serious and lasting injury, in some instances during the receivership proceedings, pending the making of "re-insurance contracts." These adverse results included the obtaining of insurance elsewhere by numerous policyholders who abandoned their insurance and ceased paying premiums to the companies in receivership, difficulties in realizing upon what assets the companies had and the loss of agents, which disrupted their sales organizations. The time between the appointment of a receiver and the transfers of business under a so-called "re-insurance contract" ranged from three months to twelve months. In the case of the nine companies named in the petition the average period was 165 days. It was necessary to place a so-called "policy lien" on the "re-insured" policies, which was in each instance as much as fifty per cent, and in the case of the Security Life Insurance Company it was one hundred per cent of the policy reserve. Policyholders either entered into express contracts with the company which executed the "re-insurance" contract with the receiver, or acquiesced in the placing of a "lien" against the reserve applicable to their respective policies of insurance. In the cases of the National Life of the U. S. A., Inter-Southern Life, Missouri State Life and Victory Life Companies new companies were formed to take over the assets and became the "re-insurers." The capital and surplus of the "re-insuring company" in each of the nine cases cited was substantially less than the aggregate amount of the "policy liens" imposed by the "re-insurance agreement."

With this experience of these companies before them, the officers of the company conferred with the defendant with a view to obtaining voluntary agreements from its policyholders authorizing the company to place against the reserves applicable to such policies a "lien," and after the company had submitted the form of its proposal and the form of the acceptance to be executed by its policyholders, the defendant wrote a letter to the company on June 8, 1934. In this letter he stated that he had given consideration to the company's proposal providing for the placing of a voluntary lien in the amount of fifty per cent of the net equity of individual policies, and that he consented to the plan outlined in the proposal if its policyholders desired to execute the acceptance on the form submitted to him. He called attention to the fact that the acceptance of the proposal was purely voluntary on the part of each individual policyholder, and stated that it was his belief that its purpose and manner of operation were clearly and correctly stated in the form submitted. The defendant said he had "no particular statutory authority to approve such a proposal," but that if he felt that "it was detrimental to the interests of the policyholders" he "would refuse to permit your company to submit such a proposal to its policyholders." He also stated that "if a sufficient number of policyholders" would "agree to the placing of a fifty per cent voluntary lien on their policies the company will have an opportunity to correct conditions arising as a result of the present economic situation, and should be able to meet its obligations to persisting policyholders."

This proposal was presented to the policyholders and between June, 1934, and March, 1935, 5507 were solicited, of whom 86.7 per cent (or 4776) signed acceptances, making the total amount of these waivers or "liens" $898,494.34. The forms of this proposal and acceptance are attached and made a part of the petition. The defendant acquiesced in the solicitation of these waivers until he received the

opinion of the Attorney General of this State rendered on March 7, 1935, in which certain objections were made to the form of the waiver or voluntary "lien" agreement. These objections included the fact that the "lien" bore no interest and the fact that the "lien" was waived on premium-paying policies in the event of death of the insured. Thereupon the company prepared a new proposal and acceptance, copies of which are also attached to the petition, and between March, 1935, and July, 1935, it solicited 606 of its policyholders, and 86.6 per cent, or 525, signed the new agreements for "liens" aggregating in amount $105,-955.17. A few policyholders signed both forms, and the net total of the waivers or "policy liens" involved, as of December 31, 1935, is $968,730.08.

The Attorney General was of the opinion that the second form of "lien" or waiver, as well as the first, was invalid. He stated in his opinion of July 18, 1935, that such a waiver or "lien" was not an admitted asset under the Insurance Company Investment act of 1933, (Ill. State Bar Stat. chap. 73, par. 368, et seq.) and that it was not a valid reduction of the reserve liability under section 10 of the Life Insurance act of 1869, (Ill. State Bar Stat. chap. 73, par. 331,) and that it constituted a violation of the Standard Provisions act of 1907. (Ill. State Bar Stat. chap. 73, par. 375, et seq.) About this time the defendant requested the company to make no further solicitation of its policyholders for waivers. The company acquiesced and sought to re-insure its business upon terms which would have rendered it unnecessary to consider the "policy liens" in valuing its policies. These efforts terminated unsuccessfully in December, 1935.

The petition then recites the fact that more than eighty-six per cent of the policyholders solicited had executed the waiver agreements, and it is stated that it is the opinion of the officers of the company that those policyholders who accepted the first proposal will accept the second form,

which is more favorable to the company, and that "policy liens" aggregating more than $1,250,000 can be obtained on the second set of forms. The company then alleges that both forms of "lien" are valid; that they should be given effect by the defendant in valuing the outstanding insurance policies of the company to which they pertain, and that the refusal of the defendant to take these waivers or "liens" into consideration in valuing the policies constitutes a breach of the defendant's statutory duty.

The last allegation of the petition is, that if the statutes of this State relative to life insurance companies, or any of the provisions of such statutes, be construed to deny to such companies and their policyholders the right to enter into agreements placing "voluntary liens" on the policies of assenting policyholders for the purpose of saving the insurance company from the disastrous effects of liquidation proceedings, such statutes or provisions would contravene section 2 of article 2 of the constitution of the State of Illinois and section 1 of the fourteenth amendment to the constitution of the United States of America, in that they would deprive the policyholder of his liberty and property without due process of law by arbitrarily and capriciously limiting his freedom to contract.

The defendant filed a motion to dismiss the petition on the ground that it does not show any warrant or authority in law for the policy liens, which he designates waivers of its liabilities, under the statute pleaded or under the statutes generally; that the petition does not show any duty imposed upon the defendant to give effect to an agreement for the waiver of the statutory requirement imposed upon the company to maintain admitted assets equal in value to the amount of all its liabilities, including its policy reserve liability and its capital stock liability, and that the petition fails to show any warrant or authority in law by which the defendant has power to give effect to such waiver of stat-

utory duty imposed upon the company. This motion is treated as a demurrer.

Life insurance companies engage in a business impressed with public interest, and this business is subject to the control of the State through the exercise of its police powers. (*Ward* v. *Farwell*, 97 Ill. 593.) These companies are required to maintain admitted assets equal in amount to their liabilities. The defendant's analysis shows that the company's capital stock is $100,000, and in addition to this item of liability it has liabilities consisting of reserve for death claims, taxes, premiums and interest paid in advance and the reserve on policies amounting to $4,539,048.68. The total liabilities are shown to equal $5,130,871.36 after deducting the company's surplus. The admitted assets total $4,270,562.23, and if the company has the right claimed to deduct the total amount of the waivers or "policy liens" from its legal reserve on policies it will have an unassigned surplus of $108,420.95. If the company has no such right the deficiency between its liabilities and admitted assets will be $860,309.13.

This court has original jurisdiction over *mandamus* suits to compel the performance of high official duties. *People* v. *City of Chicago*, 193 Ill. 507; *People* v. *Lowe*, 340 id. 51.

The Director of Insurance of this State is under the duty to determine, annually, the net value of the company's outstanding insurance policies under section 10 of the act of 1869. Ill. State Bar Stat. chap. 73, par. 331.

It is the contention of the company that its policyholders are only creditors, and that as such they are able by supplementary contracts to modify or postpone the liabilities due them and thus to preserve the continuation of the company's business and their insurance. In the event of insolvency, policyholders are general, unsecured creditors. (*Carr* v. *Hamilton*, 129 U. S. 252; *People* v. *Security Life and Annuity Co.* 78 N. Y. 114.) The defendant

contends that they are forbidden to enter into contracts with the company insuring them which in their effect waive any provision for the benefit of the policyholder, contained either in the act under which the company is incorporated or the Standard Provisions act of this State approved May 20, 1907. (Ill. State Bar Stat. chap. 73, par. 375, *et seq.*) He contends that such contracts are against the public policy of this State and are therefore void, and relies on *Chicago Railways Co.* v. *Industrial Board,* 276 Ill. 112, 117, *Tribune Co.* v. *Industrial Com.* 290 id. 402, and *Zurich Accident Ins. Co.* v. *Industrial Com.* 325 id. 452, 456, but, as pointed out by counsel for the company, those decisions were influenced by section 23 of the Workmen's Compensation act, which specifically deprived employees of the power to waive any of the provisions of that act in regard to the amount of compensation which might be payable to them, except upon approval by the Industrial Board. There is no such specific provision in the statutes here involved.

The act of May 20, 1907, relied upon by the defendant, provides that no policy of life insurance shall be issued or delivered in this State or be issued by a life insurance company organized under Illinois laws unless the policies contain certain enumerated provisions. Sub-section 6 of section 1 in effect provides that after three full years' premiums have been paid, the company, at any time while the policy is in force, will loan a sum equal to the reserve at the end of the current policy year on the policy and on the dividend additions thereto, if any, exclusive of the reserve on account of total and permanent disability and additional accidental death benefits, the policy to specify the mortality table and the rate of interest adopted for computing such reserve. Sub-section 7 provides in part: "In event of default in premium payments, after premiums shall have been paid for three years, the insured shall be entitled to a stipulated form of insurance the net value of which shall be at

least equal to the reserve at the date of default on the policy and on dividend additions thereto, if any, exclusive of the reserve on account of total and permanent disability and additional accidental death benefits, (the policy to specify the mortality table and rate of interest adopted for computing such reserve), \* \* \* and less any existing indebtedness to the company on or secured by the policy: *Provided,* that the policy may be surrendered to the company at its home office within one month of date of default for a specified cash value at least equal to the sum which would otherwise be available for the purchase of insurance as aforesaid," etc.

Section 2 provides that no policy of life insurance shall be issued or delivered in this State, or be issued by a life insurance company organized under Illinois laws, if the policy contains any of several provisions, one of which is,

"(3) A provision that in event of the maturity of any policy after the expiration of the contestable period thereof, for any mode of settlement at maturity of less value according to the company's published rates therefor then in use than the amount insured by the terms of the policy, including dividend additions, if any, after deduction of any indebtedness to the company on or secured by the policy and of any premium that may, by the terms of the policy be deducted."

Sub-section 4 of section 2 provides: "A provision that in the event of the maturity of the policy by death after the expiration of the contestable period thereof, for any modification, contingent on the cause of death, in the amount of the insurance unless such modification is expressly permitted by statute; *provided,* that this prohibition shall not apply to any additional accidental death benefits that may be incorporated in the policy."

The company says that, subject to some limitations, the right to modify policies of insurance is an incident to the right to contract, and relies upon the following from *York*

v. *Central Illinois Mutual Relief Ass'n,* 340 Ill. 595, where, in holding that a mutual benefit association could not change its contract with a member without his consent, we said: "There is no doubt that the parties to a contract may by their mutual agreement accept the substitution of a new contract for the old one with the intent to extinguish the obligation of the old contract, but one party to a contract cannot by his own acts release or alter its obligations." The company also relies on the following language from *Allen* v. *Home Nat. Bank,* 180 Atl. (Conn.) 498, 501: "A policy of life insurance is primarily a contract between the insured and the insurer and, unless rights of others have been created under its provisions, it is subject to alteration by agreement of the parties to the same extent as any other contract."

In *Steen* v. *Modern Woodmen,* 296 Ill. 104, 118, we said: "The courts must act with care in extending those rules which say that a given contract is void because against public policy, since, if there is one thing more than any other which public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into fairly and voluntarily, shall be held sacred and shall be enforced by the courts." In that decision we also said that the mere fact that a contract may waive constitutional or statutory rights, or that it may change an established rule of law, does not necessarily render the contract void on the ground that it is against public policy. We pointed out that in *Peoria Marine and Fire Ins. Co.* v. *Whitehill,* 25 Ill. 382, (original ed. p. 466,) we held that an insurance company had the right to limit the time by a clause in its policies within which an action should be brought for a loss, and that the by-law was not against public policy simply because it fixed a period less than that fixed by the Statute of Limitations; and that in *Pacaud* v. *Waite,* 218 Ill. 138, we held that parties may bind them-

selves by valid agreements to submit disputed questions to the arbitrament of tribunals other than courts, and that in *Deibeikis* v. *Link-Belt Co.* 261 Ill. 454, we held that a contract which waived the right of trial by jury was not against public policy.

In *Ballou* v. *Davis,* 75 Fed. (2d) 138, and *Daniel* v. *Layton,* id. 135, the validity of the so-called "re-insurance contracts" was questioned. The criticisms made were on other grounds, but the contracts were held good. These contracts, like all such others that have been called to our attention, included waivers or "policy liens" either expressly made or tacitly agreed to by the acquiescence of such policyholders as were willing to continue to pay the premiums on their policies to the company which took over the assets of the company in liquidation and receivership. In the *Ballou case,* at page 140, the substance of a letter from the defendant, as Director of Insurance, is set out. In it he approved the contract there under consideration.

We do not have as a question in this case the validity of such contracts entered into between policyholders and the so-called "re-insuring" company, but it is urged by the company that each of the "re-insurance" contracts that has been entered into in the liquidation and receivership of the companies named in its petition has contained a waiver or "policy lien" provision. Those policyholders who were willing to continue payment of their premiums either acquiesced or by express contract agreed to such reduction of the reserve set up under the Illinois statute in the cases involving Illinois insurance companies, and in all the cases these waivers were of from fifty per cent to one hundred per cent of the reserve. No new policies or premiums on such policies would be figured in the administration of the assets taken over or the premiums paid by the assenting policyholders of the liquidated company, but the business carried on in that behalf by the "re-insuring" company is the business of insurance, and the same annual reports and

other statutory requirements are applicable to that business. The Director of Insurance must perform the same duties with reference thereto that he must perform with reference to solvent companies.

In this State insurance policies that are issued must conform to the Standard Provisions act, and insurance companies may not continue in business here if they do not meet the standard of solvency contained in the statute, but if their policyholders who are fully advised as to their financial condition choose to enter voluntarily into contracts which waive a provision of the statute enacted for their benefit and protection, after such policies have been issued and before a receivership or liquidation proceeding has been commenced, in order to protect their insurance policies and to save to the company the loss of assets and expense of receivership and liquidation, these policyholders who are not·under compulsion or duress· and who are not the victims of fraud or deceit have this contractual right. Their contracts are valid and are enforcible.

The defendant relies upon our holding in *Chicago Life Ins. Co.* v. *Auditor of Public Accounts,* 101 Ill. 82, but that decision does not conflict with the views we have expressed. The standard of solvency set up in section 10 of the act of 1869 as amended will still be required and will be applicable to all policies of insurance to be issued hereafter by the company, and it will also be applicable to the reserves not waived by the voluntary agreements of present policyholders.

It is not material whether the defendant, as Director of Insurance, treats these contracts of waiver, which are called "policy liens," as assets, or permits the company in its annual statement to show them as deductions from the reserve liabilities. The effect reached in either case is to reduce the liabilities of the company and to give effect to the contracts. The consideration for these agreements need not be something which passes into the hands of the policy-

holder. All the policyholders need not execute the waiver contracts, and there is no requirement, if these contracts are treated as waivers and not as investments, that interest be charged to the policyholder on the amount of reserve he waives, although such a charge would be more favorable to the company.

Since the life insurance statutes of this State do not prohibit these waiver contracts, and we hold that they are within the power of the policyholders and the insurance company to make, there is no necessity to pass upon the constitutional question raised by the company. Both forms of waiver contract are valid and such as the defendant should have recognized. He should have permitted the American Bankers Insurance Company in its annual report to reduce its liabilities by the amount of these waivers.

The writ of *mandamus* is therefore awarded as prayed.

*Writ awarded.*

Mr. JUSTICE WILSON, dissenting:

I do not concur in the opinion of the majority of the court. Section 10 of the Life Insurance act of 1869 (State Bar Stat. 1935, p. 1876; Smith-Hurd Stat. 1935, p. 1843;) commands the Director of Insurance to "annually make valuations of all outstanding policies, additions thereto, unpaid dividends and all other obligations of every life insurance corporation doing business in this State." The same section also provides that if the director "shall find, in the case of any company doing business under this act, that the admitted assets of a stock life insurance company in excess of the minimum amount of capital stock required under this act, * * * are less than its liabilities, including the net value of its policies computed by the standard of valuation established by this section, such department [director] shall give notice to the company of the amount of such deficit as determined by it, [him,] and shall require that the deficit be made good," etc. The allegations of the relator's petition disclose that the company is insol-

vent and that the Director of Insurance has so found. The manifest legislative intent of the Insurance act of 1869 and the Standard Provisions act approved May 20, 1907, is the protection of citizens of Illinois and of other States doing business with insurance companies organized conformably to the laws of this State. These salutary statutes were enacted for the purpose of assuring persons transacting business with Illinois insurance corporations that such companies would, at the time contemplated in the policies issued by them, be able to pay their policies in full, and, further, to assure the persons insured that they would be fairly dealt with upon the high standard of solvency prescribed by the legislature. The Life Insurance act of 1869 and the Standard Provisions act are declaratory of the public policy of this State. They inhibit transaction of the business of insurance in Illinois by any corporation contrary to their regulations by annulling all the stipulations which offend the provisions of the statutes. *New York Life Ins. Co.* v. *Head,* 234 U. S. 149.

The statutory provisions invoked by the parties in this case are free from ambiguity and hence do not require construction. The Director of Insurance has no power, under the statutes in question, to give effect to the waiver agreements designated "voluntary liens," and no duty, therefore, rests upon him to consider such waiver agreements either as a reduction of the relator's statutory reserve liability or as an asset to offset the relator's statutory reserve liability. The majority opinion nevertheless holds that the policyholders may enter into contracts with the company waiving the foregoing and other provisions enacted for their benefit, irrespective of whether contained in the statute under which the company was incorporated or in the Standard Provisions act. In particular, the decision rendered in this case holds that the statute prescribing a specific standard of solvency for legal reserve companies may be nullified by contract, and, further, that the statute prescribing and pro-

hibiting other provisions in life insurance policies may be nullified by agreement of the parties. In short, the standard of solvency prescribed by the legislature is completely abrogated by this decision.

The majority opinion ignores the fundamental principle that the charter of the relator is a contract between the State of Illinois and the company. (*Ward* v. *Farwell,* 97 Ill. 593.) Its charter necessarily includes all statutory requirements imposed, and it cannot be changed without the consent of the State. (*North American Ins. Co.* v. *Yates,* 214 Ill. 272; *Chicago Life Ins. Co.* v. *Auditor of Public Accounts,* 101 id. 82; *Ward* v. *Farwell, supra.*) Likewise, every insurance contract is impressed with the applicable statutory provisions. By its charter the company agreed to maintain all required reserves to make its policies conform to the mandatory provisions of the statute with respect to its solvency. Failure to satisfy these requirements constitutes a violation of the contract between the company and the State. In the present case it is conceded that the relator company has violated its charter contract. By reason of such violation it has forfeited its right to engage in the insurance business, and that right, in consequence, may be taken from it in the manner directed by statute. By the proposals of the relator set forth in the majority opinion it endeavors, through agreements made with its policyholders, to effect a waiver of a mandatory statutory provision, namely, to maintain at all times admitted assets equal to all liabilities, including the capital stock liability, and, particularly, its policy-reserve liability. No statutory authority for the imposition of the voluntary liens sought by the relator exists, and it has failed to show any other legal authority for the reduction of the liability imposed by the legislature.

It is not the province of a court to substitute itself for the Department of Insurance and assume the clearly-defined obligation which the legislature has delegated to that ad-

ministrative agency. (*People* v. *Niehaus*, 356 Ill. 104.) The statutory provisions previously mentioned require no interpretation, so far as the present action is concerned. By undertaking to permit the re-organization of the relator insurance company as prayed for, this court arrogates to itself the performance of the duties, in part, of a court of chancery but without the power which such a court inherently possesses to effectuate the re-organization. The effect of the repeal by this court of the standard of solvency commanded by the insurance laws of this State is far-reaching. Sanctioning nullification or modification of this legislation by contracts between the insurer and the insured will inevitably tend to bring about a condition where certain and definite standards of solvency of insurance companies will be completely lacking.

In my opinion the writ of *mandamus* should be denied.

ORR, J., and HERRICK, C. J., concur in this dissenting opinion.